Thomas and Mary SOMMERS, and all
others similarly situated

v.

**ABRAHAM LINCOLN FEDERAL SAV-
INGS AND LOAN ASSOCIA-
TION et al.**

Civ. A. No. 72–2269.

United States District Court,
E. D. Pennsylvania.

March 25, 1975.

Arnold Levin, Freedman, Borowsky & Lorry, Philadelphia, Pa., for plaintiffs.

Robert W. Sayre, Philadelphia, Pa., Liaison Counsel for defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

The present suit was originally brought by five mortgagor couples on behalf of themselves and all others similarly situated against 172 mortgage-writing institutions located in this District. Plaintiffs' claims arise from these institutions' alleged practice of requiring mortgagors to prepay monthly into escrow accounts with defendants a sum equal to one-twelfth their annual expected property tax, mortgage insurance premiums, assessments, and water and sewer rentals. Under this practice, called "escrowing", the mortgagee institutions do not pay the mortgagors any interest on the prepaid amounts, which the mortgagees remain free to commingle with other funds and to invest. Plaintiffs complain that "sometime in the nineteen-sixties" defendants conspired to switch from the "capitalization" method of prepayment,[1] under which the principal owed by the mortgagor would be reduced by an amount equivalent to each month's prepayment, to the non-interest paying escrowing method, and that this conspiracy unreasonably restrains trade in violation of the Sherman Act, Section 1.[2] Plaintiffs also claim a "tie-in" between the mortgage and the escrow prepayment requirement, also in violation of Section 1 of the Sherman Act. Plaintiffs, now numbering over eighty individuals, seek certification as representatives of a class of all those persons who hold mortgages with the defendants and who prepay taxes, premiums, assessments, or rentals into escrow accounts with defendants. Plaintiffs also seek to certify

---

1. This method is sometimes referred to as the "principal debt balance method."

2. 15 U.S.C. § 1 (1898).

defendants as representatives of a class of lending institutions who escrow such prepayments. Defendants vigorously oppose both certifications. For the reasons discussed below, we decline to certify defendants as class representatives, and we create two subclasses of mortgagors from the class proposed by plaintiffs, each subclass to be represented under Federal Rule 23(b)(3) by those named plaintiffs whose claims are typical of those of the subclass.

## I. DISCUSSION

### i. *Plaintiffs' Claims.*

This section will provide a slightly more detailed outline of plaintiffs' claims than does the paragraph above. The remaining original [3] plaintiffs, as well as the intervening plaintiffs, are mortgagors of many, but not all, of the defendant lending institutions. They allege that their mortgage agreements with defendants require them to prepay property taxes, mortgage insurance premiums, assessments, and sewer and water rentals into escrow accounts on which they are paid no interest. They allege that defendants invest and earn interest on these escrow funds. Plaintiffs do not challenge the legitimacy of the mortgagees' concern that funds are available to meet these liabilities as they come due, since non-payment could result in a lien on the mortgaged property with a higher priority than the mortgagees' lien. Rather, plaintiffs contend that during the nineteen-sixties defendants conspired among themselves and other unnamed institutions to switch from a method whereby the principal owed on the mortgage is reduced to equal the amount of the prepayments (and increased by the same amount when the liabilities are ultimately paid) to the escrow method, whereby the principal is unaffected and the prepayments are held in non-interest paying accounts. Plaintiffs contend that this conspiracy achieved the virtual elimination of the capitalization method as an alternative to the escrow method, thus reducing competition between lending institutions in violation of Section 1 of the Sherman Act. Plaintiffs also contend that defendants condition their mortgage loans on the mortgagor's acquiescence in the escrow method, constituting an illegal tying arrangement under Section 1 of the Sherman Act. Plaintiffs' complaint also challenged the escrow method as violating various other federal and state laws, but these claims were dismissed by this Court.[4] The only claims presently involved are plaintiffs' Sherman Act claims.

### ii. *Facts Elicited by Discovery on Class Action Motions.*

The parties have been engaged in discovery on the class action motions for approximately the past year. Plaintiffs have addressed numerous interrogatories to defendants' prepayment requirements. The answers to these interrogatories show sharply divergent practices among the defendants with regard to mortgagor prepayments. The first variation appears between mortgage loans which are insured by government agencies (e. g., Federal Housing Administration, Veterans Administration) and those which are not. Most defendants require escrowing for at least tax and insurance liabilities on all government insured

3. Two of the original plaintiff couples, David and Mary Kinee and John and Ellen Schreiber, have withdrawn from the case. Both wives were employees of plaintiffs' counsel's firm, and both withdrew when this employment relationship was terminated. The caption of this case was subsequently changed to Sayre, et al v. Abraham Lincoln Federal Savings & Loan Association, and a decision relating to discovery was reported under that heading at 43 U.S.L.W. 2193. However, since *Sayre* was the name of both plaintiffs and lead counsel for defendants, the parties stipulated to change the caption to its present form.

4. David and Mary Kinee v. Abraham Lincoln Federal Savings and Loan Association, D.C. Pa., 365 F.Supp. 975 (1973).

mortgages. However, this uniformity of escrowing disappears when defendants' conventional (i. e., non-government-insured) mortgages are examined. As for escrows for taxes, 35 defendants[5] require tax escrows in connection with all conventional loans, 32 require tax escrows for some but not all conventional loans, and 15 defendants never require tax escrows in connection with conventional loans. (Three named defendants do not escrow at all). As for insurance premiums, 19 of the defendants never escrow for these charges; 15 never escrow in case of conventional loans; 8 require such escrows in the case of all conventional loans; 30 require insurance escrow in connection with some but not all conventional loans; and 10 accept but do not require escrow payments in connection with conventional loans.

Seventy-three of the defendants do not escrow for assessments; 65 do not escrow for water charges, while 61 do not escrow for sewer rents.

The variations do not end there. The responses to plaintiffs' interrogatories demonstrate that the defendants who require escrows on less than all loans apply different criteria in making their decisions. Many have no numerical criteria for the application of escrow requirements. Within this group, practices vary from those who appear to base their decision primarily on the amount of the mortgagor's equity in the property, to those who seem to place emphasis on the financial strength of the borrower, to those who weigh the availability of other security, to those who assess "all relevant factors".

iii. *Class Action Issues. Prerequisites of 23(a).*

■ Before the named plaintiffs can be certified as class representatives under either 23(b)(2) or (b)(3) they must satisfy all the prerequisites of 23(a)(1–4). Plaintiffs must show that the class is "so numerous that joinder of all members is impractical" (a)(1); that "there are questions of law or fact common to the class" (a)(2); that their claims are "typical of the claims or defenses of the class" (a)(3); and that they "will fairly and adequately protect the interests of the class" (a)(4). Plaintiffs bear the burden of proving that they satisfy each of those prerequisites.

■■ The first requirement does not provide plaintiffs much difficulty. There are presently in excess of 370,000 mortgagors of defendant banks located in this District. There are already 80 named plaintiffs in this suit. The numerosity requirement has been amply satisfied. Nor does the "commonality" requirement pose a problem. Rule 23(a)(2) does not require that common questions predominate, but only that they exist. Plaintiffs have alleged that defendants conspired to eliminate the capitalization method as a competitive alternative to the escrow method of prepayment. This is clearly a common issue of fact.

Rule 23's "typicality" requirement, however, does pose a substantial problem in this case. The meaning of this "typicality" requirement has perplexed many courts and commentators. Rarely has a court discussed this requirement at length. Professor Moore has stated that:

"the (a)(3) requirement that claims or defenses be "typical" has been equated with the (a)(4) requirement that the representative party must adequately represent the class, or with one of the elements usually considered as part of this adequacy requirement, i. e., that the interest of the representative must be co-extensive with the interests of the other members of the class, and that there be a lack of adverse interests between the repre-

5. Eighty-six of the 105 defendants in this case provided the information requested in plaintiffs' class action interrogatories.

sentative party and other members of the class." 3B Moore's Federal Practice ¶ 23.06–2 at 23–325 (1975).[6]

It is not surprising that subdivision (a)(3) is equated with (a)(4) since both seem intended to insure that plaintiffs will fully present the claims of the class members. The typicality requirement insures that no class member's claim or significant aspects of that claim will go unrepresented by plaintiffs; the "adequate representation" requirement insures that plaintiffs' interests are co-extensive with the class members, and that no conflicts of interest exist. While these requirements overlap considerably, they are not redundant since situations are conceivable where plaintiffs and class members have similar claims but not co-extensive interests, as when, for example, after a race discrimination suit has been filed, the named plaintiffs are given promotions which the complaint alleges all class members were discriminatorily denied.

 Plaintiffs contend that their claim that defendants restrained trade by conspiring to eliminate the capitalization method is typical of the class' claims. However, in determining the congruence of plaintiffs' claims with the class members', a court must take into account not only the allegations of the complaint but the nucleus of facts which underlie those allegations and the evidence necessary to prove them. Siegal v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967), aff'd sub nom. Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969). While plaintiffs' claims need not be identical with the class member's, Siegal v. Delight, Inc., *supra*, 271 F.Supp. at 727, they must be

similar enough to permit the court to conclude that the claims of the absent class members will be fully presented should the suit proceed as a class action. The class action discovery in this case reveals several dissimilar fact situations among the class members. One such dissimilarity, that between conventional and government insured mortgages, is sufficiently great so as to preclude the named plaintiffs' claims from typifying those of the class as a whole. Plaintiffs admit that Veterans Administration guidelines encourage escrowing and that FHA regulations mandate it, although, plaintiffs are quick to add, neither agency's regulations preclude the payment of interest on escrow accounts. The question of whether agency regulations sanction escrowing is an issue which will face class members with insured loans but not those with conventional loans. In addition, since plaintiffs in this case must show that any agreement among defendants resulted in an unreasonable restraint of trade, putative class members with insured mortgages would have to present evidence on many issues which may be absent in the case of non-federal insured class members.[7] Since we feel that these uncommon issues are complex and require extensive evidence we cannot conclude that the named plaintiffs, some or all of whom may have conventional mortgages, will fully litigate the facts underlying the claims of those with federally insured mortgages. The inadequacies of representation which lurk beneath the potential atypicality of plaintiffs' claims can only be cured by division of the putative class into two subclasses, defined along the lines discussed above.[8]

---

**6.** The 23(a)(3) requirement has also been equated with the "common issues of fact or law" requirement of 23(a)(2). 3B Moore's Federal Practice ¶ 23.06–2, at 23–325 (1974).

**7.** It is likely that defendants would introduce evidence of the government regulations on the issue of the reasonability of escrowing in

connection with conventional loans. However, this Court cannot rely on this in determining that plaintiffs' claims are typical of those of the class.

**8.** The power to create subclasses from a proposed class is found in subsection (c)(4)(B) of Rule 23. Should it appear at or before trial that all of the named plain-

■ The discovery reveals other dissimilarities which, defendants argue, render plaintiffs' claims atypical of the class members. Chief among these are the differing liabilities for which each defendant escrows and the differences among defendants as to whether mortgagors are required to make escrow payments or volunteer to do so. While the lack of uniformity among the liabilities for which defendants escrow will make proof of the alleged conspiracy and unreasonable restraint of trade more difficult, it does not so greatly affect the amount or scope of that proof as to make plaintiffs' claims atypical of those of the class. Similarly, the issue of voluntariness is no bar to typicality here, since the harm alleged is not that escrowing was required in each defendant's mortgage agreement but that there was a conspiracy to eliminate a prepayment method which was a viable alternative to escrowing. Thus, if plaintiffs could show that defendants agreed not to offer any prepayment method but escrowing, it would be immaterial whether a mortgagor agreed to escrowing, since his only alternative was no prepayment at all. (Of course, a mortgagor who chose escrowing without interest over capitalization could not be a proper representative or member of plaintiffs' class).

■ Defendants further argue that plaintiffs' claims cannot be typical of those of mortgagors who entered into their present mortgages before the 1960's, the period when, according to the Complaint, the alleged conspiracy took place. With this argument we would agree. No pre-1960 mortgagor can properly be either a named plaintiff or a class representative in this suit.

■ One typicality problem remains: can the claims of plaintiffs, who have never dealt with some of the named defendants, be typical of the claims of

mortgagors who have dealt with these defendants? Defendants cite LaMar v. H&B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973) and this Court's decision in Weiner v. Bank of Prussia, D.C.Pa., 358 F.Supp. 684 (1973), as standing for the proposition that a plaintiff cannot represent a class of persons who dealt with defendants with whom the plaintiffs had no dealings. However, neither of these decisions dealt with a properly alleged conspiracy. In LaMar, the Court said that the rule that a plaintiff could not represent a class against defendants with whom he had not dealt "does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between defendants at whose hands the class suffered injury." 489 F.2d at 466. In Weiner, this Court found that no conspiracy count had been properly pleaded and that the statutes under which plaintiff was suing did not create a cause of action for conspiracy. The Weiner holding is thus inapposite to the present facts.

■ As for the final requirement of 23(a) we find that plaintiffs have shown that they will "fairly and adequately protect the interests of the class" 23(a)(4). The courts and commentators have interpreted this section to require that plaintiffs' and the class' interests be co-extensive (or at least that they not conflict) and that plaintiffs' counsel possess the proven ability to conduct such litigation. Williams v. Local 19, 59 F.R.D. 49 (E.D.Pa.1973), Mearsay v. First Republic Corp., 43 F.R.D. 465 (S.D.N.Y.1968). Some courts have spoken of an additional requirement that the named plaintiffs, independent of their counsel, show an interest in the lawsuit and experience with its subject matter. In Re Goldchip Funding Co., 61 F.R.D. 592 (M.D.Pa.1974).

Once plaintiffs' class is redefined along the lines discussed in the section

tiffs in the government-insured mortgage subclass are insured by one agency rather than the other, the Court has the power un-

der 23(c)(1) to "decertify" the class for the protection of the unrepresented mortgagors.

dealing with typicality of claims, *supra* at pp. 7–9, plaintiffs' interest will be co-extensive with those of the class. Both plaintiffs and the class members will then be seeking a common relief i. e., the return to the capitalization of prepayments for mortgage liabilities or the payment of interest on escrows for those prepayments.

▮▮▮▮ There is no question that plaintiffs' counsel is experienced in the conduct of a class action and that plaintiffs' counsel's firm is experienced in the conduct of antitrust actions. However, defendants point to several facts, elicited at prior hearings on this case or in depositions of some named plaintiffs, which they contend prevent the named plaintiffs from adequately representing the class. The first is the employment status of the five original plaintiff couples. One of each of these couples was, at the time suit was filed, employed by plaintiffs' counsel's law firm. The situation of the original plaintiffs may have been analogous to that of the plaintiff who is, or is a partner or spouse of, plaintiff's counsel. Several courts have found that this situation creates potential conflicts which prevent the plaintiff/counsel from adequately representing the class. Stull v. Pool, 63 F.R. D. 702 (S.D.N.Y.1974); Graybeal v. American Savings & Loan Ass'n., 59 F. R.D. 7 (D.C.1973); Cotchett v. Avis Rent A Car System, Inc., 56 F.R.D. 549 (S.D.N.Y.1972). However, whatever inadequacies may have existed have been cured by the intervention of numerous other named plaintiffs. Nothing in the record demonstrates that the intervenors were brought into this suit unethically or are mere straw figures for plaintiffs' counsel. Othra & Gertrude Sayre, et al., v. Abraham Lincoln Federal Savings & Loan Association, 65 F.R.D. 379 (E. D.Pa.1974).

Defendants also argue that plaintiffs are inadequate representatives because they are both unaware of their financial responsibilities in this suit and unable to meet them and because their lack of participation in court proceedings evinces a lack of interest in the suit. We can dispense with the latter contention quickly, for there has been only one non-scheduling court proceeding in this case to date. As for the former contention, we have dealt at length with the relevancy of plaintiffs' ability to pay the costs of suit in our prior Memorandum, Sayre v. Abraham Lincoln Savings and Loan Ass'n, cited *supra*, and there is sufficient evidence that plaintiffs are aware of their ultimate responsibilities to bear the costs of suit.

*Applicability of 23(b)(2).*

We will assume that plaintiffs will provide the Court with the information which will allow it to divide the proposed class into the two proper subclasses and will therefore discuss the applicability of (b)(2) and (b)(3) to the suit in order to avoid unnecessary delay.

▮▮▮▮ This is perhaps the classic example of a case that is not appropriate for (b)(2) certification. According to Rule 23, a (b)(2) suit is permitted when the opposing party has acted or refused to act on grounds generally applicable to the class. This Circuit has recently discussed at length the purposes which underlie the (b)(2) category, as well as characteristics which distinguish it from a (b)(3) action. Wetzel v. Liberty Mutual Insurance Company, 3 Cir., 508 F. 2d 239 (1975).

In *Wetzel* the court declared that a (b)(2) class was proper not only when an injunction was the principal relief sought but in all circumstances where defendant has acted on grounds generally applicable to the class and where plaintiff seeks equitable relief. The discovery in this case clearly shows that defendants have not acted on grounds generally applicable to the class, (or subclasses). Moreover, the Advisory Committee's Note to (b)(2) states that "the subdivision does not extend to cases in which the appropriate final relief relates

exclusively or predominately to money damages." The exception to this statement carved out in *Wetzel* seems limited to those forms of monetary relief, such as back pay in a racial discrimination suit, traditionally styled "equitable", and would not cover treble damages in an antitrust action.

*Applicability of (b)(3).*

Rule 23 provides that a suit may be maintained as a class action under (b)(3) where:

(1) the questions of law or fact common to the class predominate over questions only affecting individual members; and,

(2) the class action is "superior to other available methods for the fair and efficient adjudication of the controversy."

There is an overlap between the typicality and adequate representation requirements, 23(a)(3) and (4), and the predominance requirement of (b)(3). Many of the issues relevant to whether common issues predominate in this suit have already been discussed in the sections dealing with typicality and adequate representation, *supra,* pp. 6–13. However, while 23(a)(3) and (4) are directed towards the protection of the class members from potentially inadequate representation by the plaintiffs, the predominance requirement seeks to protect the Court and the public from the confusion and waste of resources occasioned by collective adjudication of separate claims or the separate adjudication of common claims. It is for this reason that Rule 23 requires a finding of predominance independent of the findings of typicality and adequate representation.

"The predominance finding requires at a minimum the identification of the legal and factual issues, common and diverse, and an identification of the class members to which those relate." Katz v. Carte Blanche, 496 F.2d 747 (3rd Cir. 1974), cert. den., 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). The issue of whether defendants conspired is an issue common to all class members since it requires the same proof from each of them, but its presence alone does not establish predominance.

". . . [an] allegation that a conspiracy existed to violate the antitrust laws does not insure that common questions will predominate." In re Hotel Telephone Charges, 500 F.2d 86, 89 (9th Cir. 1974).

A second issue which is critical in this case is the unreasonability of the alleged restraint. The resolution of this issue will require evidence on the factors delineated [9] in Chicago Bd. of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), as well as in subsequent "rule of reason" cases. While this evidence will vary depending upon which type of escrow account is challenged (i. e., taxes, assessments etc.) we believe that there will be a considerable overlap of evidence, enough to justify classifying reasonability as a common issue. The issues of whether federal regulations encourage escrowing or make it reasonable are common to each of the subclasses which the Court has created.

We have until now refrained from discussing plaintiffs' claim that defendants illegally "tied" escrowing to the extension of mortgage money, in violation of the Sherman Act, Section

9. These factors include the market in which the product subject to the restraint effectively competes (relevant product market); the geographic market in which it effectively competes; the percentage of the market affected by the alleged restraint; the size and strength of the competition; the existence or non-existence of barriers to entry and the effect of the practice thereon; the purpose behind the alleged restraint; and the effect of the restraint on price or availability of products.

1.[10] Assuming the existence of two distinct products which could be tied together, the question arises as to whether plaintiffs must show that each class member was coerced into accepting the alleged tie. If we decide that coercion is an element of plaintiffs' case, then individual questions would predominate over common ones, and certification under (b)(3) for this claim would be inappropriate. Capital Temporaries, Inc., v. The Olsten Corp., 365 F.Supp. 888 (D. Conn.1973), aff'd 506 F.2d 658 (2nd Cir. 1974); Bogosian v. Gulf Oil Corp., 62 F.R.D. 124 (E.D.Pa.1973); Abercrombie v. Lum's, Inc., 345 F.Supp. 387 (S.D.Fla.1972). However, we agree with Judge Becker's recent thoughtful opinion that coercion is merely one means of proving a defendant's use of market power and that a tying claim can proceed on a (b)(3) class basis if there is a prima facie showing of a uniform policy of enforcing the tie on defendant's part. Ungar, et al., v. Dunkin 'Donuts, Inc., Civil Action Numbers 72–88, 72–1526 (E.D.Pa., March 12, 1975). Plaintiffs herein have made such a showing with regards to escrowing for taxes and insurance in connection with government-insured loans. (See Exhibit A to Appendix to Defendants' Brief in Opposition to Plaintiffs' Motion to Determine the Class).

Such a showing has not been made for the other escrowed expenses in connection with government-insured mortgages, or for any escrowed expenses in connection with non-government insured mortgages. Therefore the plaintiffs representing the subclass of government-insured mortgagors will be certified as representatives of these mortgagors' illegal tie-in claim with respect to tax and insurance escrows, but no plaintiffs shall be certified in connection with any other tie-in claims. While it is true that Judge Becker's decision states an alternative form of proving use of market power which could be tested in the class action context, i. e., that an appreciable number of buyers have accepted a burdensome and uneconomic tying arrangement, *Dunkin Donuts*, cited *supra*, at 136, we believe that the discovery in this case shows that the issue of whether escrowing was burdensome or uneconomic is more an individual than a common one.

The two remaining issues are whether the alleged antitrust violation has injured each class member ("impact") and, if injury is found, the amount of each class member's damages. Defendant argues that differing facts would govern the extent of each class member's injury by the alleged violation, but we believe that, with minor variations, the evidence of impact would be common to all class members. Damages, however, are undeniably individual in proof. Nonetheless, we do not believe that the individual damage questions will detract from the efficiency of the class action device in resolving this controversy. The proper test is not the amount of time or attention required to litigate these individual questions,[11] since a great amount of time would be consumed in litigating these questions if the class members brought numerous individual actions, but the severability of the issues of liability and damages so that "the asserted statutory violations can be effectively adjudicated in a class proceeding independent from the proceeding in which individual damages would be assessed." 3B Moore's Federal Practice ¶ 23.45[2], (1974 ed), at 23–

10. We declined to dismiss this claim in our earlier opinion dealing with defendants' motions under Rules 11 and 12(b)(6), David and Mary Kinee v. Abraham Lincoln Federal Savings and Loan Ass'n, D.C.Pa., 365 F. Supp. 975 (1973), even though we termed "strained" the plaintiffs' allegation that escrow prepayments and mortgage loans constitute separate products. At that time we stated that it was better practice to allow completion of discovery before ruling on the separateness of these entities.

11. Minnesota v. United States Steel, 44 F.R. D. 559 (D.Minn.1968).

758. The damage issues in this case appear to be severable from the liability issues.

Some of the factors listed in 23(b)(3) (A–D) [12] do not apply here. There is no other litigation concerning this controversy pending in this District. Nor is there any other indication of the "interest of members of the class in individually controlling the prosecution . . . of separate actions." 23(b)(3)(A). The desirability of concentrating the litigation of these claims in this court is fully apparent, since the parties are located in this District. Finally, we find that this action, when it is divided into the two subclasses, will be manageable. (This factor is discussed more fully at 592).

▮▮▮ Rule 23 also provides that the class action method must be the superior method of trying a suit before it can be certified as a (b)(3) class action. In terms of the four criteria provided in 23(b)(3)(A–D), the class action mechanism seems clearly superior. There is no competing litigation in this District, nor any other indication that class members have an individual interest in controlling separate litigation. A class action here is definitely preferable to a consolidated trial with the prospect of massive intervention or the separate trial of each of the named plaintiff's claims. Although there will be difficulties in managing two subclasses of the size involved herein, they will not be unmanageable. For example, if we accept plaintiffs' statements on the matter, the costs and burdens of notifying class members is much less than would be expected with subclasses of comparable size. Defendant argues that an individual, private antitrust action would be preferable to a class action in this situation, and that since the antitrust statutes provide for counsel fees, such a suit is feasible. This matter involves thousands of mortgagors, each with minimal damages; defendants' argument ignores the ceiling which these damages would effectively place on counsel fees in an individual action. Defendants' argument also ignores the fact that some eighty individuals have intervened in the present case, which means that the practical alternative to a denial of class is a mass trial without *res judicata* effect.[13]

In this case we have used our powers under 23(c)(1) to mold subclasses which will meet the requirements of 23(a)(3) and (4) and 23(b)(3). There is little data available on the experience of courts in the conduct of subclass actions and we can not, therefore, be entirely sure that the creation of subclasses will achieve the results which we ascribe to it. However, we cannot assume that a device which is expressly provided for by Rule 23 is without value.

*Defendants' Class.*

▮▮▮ Plaintiffs also request that this Court certify defendants as representatives of a class of all institutions in this District who lend money on mortgages

---

12. 23(b)(3) states:
"the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions: (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

13. The alternative of a test case with "one-way" *res judicata*, such as was approved in Katz v. Carte Blanche, 496 F.2d 747 (3rd Cir. 1974), cert. den. 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974), is unavailable since defendants have not indicated that they would accede to such a procedure, a precondition of the *Katz* test case alternative.

to which tax or other prepayments are made into escrow accounts on which no interest is paid. We will, with few words, deny this request. Plaintiffs have presented no evidence to support the conclusion that the named defendants' claims are typical of those of the purported class, 23(a)(3), or that the named defendants will adequately protect the interests of the absent class members. 23(a)(4).

In this regard, it is difficult to imagine what interest the named defendants would have in proving that an absent defendant did not conspire in violation of the antitrust laws.[14] The interest of a named defendant would seem to be limited to defending against the claim that it so conspired.

---

14. Conversely, plaintiffs' counsel would have an interest in proving the liability of all defendants since the more extensive the con- spiracy the greater the amount of recovery, and thus the amount of counsel fees, is likely to be.