**3.** This is on the theory that lawyers too are entitled to a Declaration of Independence.

Eugene **STEWART** et al., Plaintiffs,

v.

William **WINTER** et al., Defendants.

No. GC 80–113–WK–O.

United States District Court,
N. D. Mississippi,
Greenville Division.

Oct. 7, 1980.

Bruce Johnson, Lexington, Miss., Stella Terrell & Solomon, McComb, Miss., for plaintiffs.

John W. Whitten, Jr., Sumner, Miss., Jack N. Thomas, Amory, Miss., Hugh R. Varnado, Jr., Belzoni, Miss., Pat M. Barrett, Lexington, Miss., Arthur M. Edwards, Jr., West Point, Miss., William H. Odom, Laurel, Miss., Thomas E. Childs, Jr., Fulton, Miss., P. Roger Googe, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this case, plaintiffs are eighteen former and present inmates of county jails in Clay, Holmes, Humphreys, Jones, Monroe, Pontotoc, Lauderdale and Tallahatchie Counties who sue on behalf of themselves and all persons "who now or will be in the future confined in county jails or county farms in Mississippi." Eight of the named plaintiffs are no longer incarcerated in

county jails and are presently imprisoned at the Mississippi State Penitentiary, at Parchman, serving time for felony convictions. Six plaintiffs are in county jails, having been convicted of felonies and awaiting transfer to the state penitentiary; the remaining four are pretrial detainees in county jails. Federal court jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 for causes of action allegedly arising under 42 U.S.C. § 1983 to redress grievances suffered by plaintiffs and the class they represent for deprivation of federally–protected rights by defendants acting under color of state law.

Named as parties defendant are certain state officials including the Governor, Commissioner of Corrections, and members of the State Board of Corrections, health officers and fire marshal officials. Also joined as defendants are (a) the sheriffs of each of the above named counties who are sued individually and as representatives of a defendant class consisting of all sheriffs in the state's 82 counties; (b) the members of the boards of supervisors of said counties who are sued individually and as representatives of a defendant class consisting of the members of all boards of supervisors (410) in Mississippi; and (c) the county health officers of the eight named counties who are sued individually and as representatives of a defendant class composed of all county health officers throughout Mississippi.[1]

Plaintiffs seek declaratory and injunctive relief, damages, attorney fees and costs. Plaintiffs' original demand of $3,500,000 for compensatory and punitive damages against defendants, jointly and severally, has been increased to $10,000,000. In general, plaintiffs claim that the conditions which exist in the county jails throughout the state violate rights of persons incarcerated in such jails which are protected by the first, sixth and eighth amendments as well as the Equal Protection and Due Process Clauses of the fourteenth amendment to the United States Constitution.

---

1. Plaintiffs' second amended complaint has deleted as parties defendant justice court judges in the eight named counties, and has added as

defendants the sheriff, supervisors and health officers of Sharkey County.

Defendants have moved to dismiss the class action on grounds that the requirements of commonality and typicality required by Rule 23(a)(2) and (3), F.R.Civ.P., to constitute the plaintiff class are not present, that the physical conditions and administrations of county jails widely differ, that the state officials have no authority or right to control such jails, that the named local defendants have no actual control or power to control the policies, practices or conditions of any county jail other than the one under their jurisdiction, that the named defendants cannot adequately represent the defendant classes, and that the maintenance of the case as a class action would be altogether unmanageable.

In this complaint, plaintiffs charge that the physical facilities of Mississippi's county jails "as a general rule are unfit for human habitation" (Complaint, ¶ 51); that of these jails, "20 require minor repairs, 29 need major repairs and 23 need replacing" (¶ 54); jails are overcrowded (¶ 55); severe and unreasonable restrictions are imposed on visits to prisoners and inmate mail (¶ 56–58); prisoners are forced to live in fear of their safety from assaults by fellow inmates and guards (¶ 59), because of inadequate classification and security precautions (¶ 60); jails fail to provide adequate medical care (¶ 62–67); inmates do not have access to law books and legal materials (¶ 68); jail staffs are inadequately trained (¶ 69); prisoners are forced to be idle (¶ 72–73); and insufficient recreational and educational opportunities are provided (¶ 74–77).

Plaintiffs' main contention is that the totality of the physical and environmental conditions prevailing in county jails throughout the state, and the manner in which they are being maintained and operated by local officials, subject jail inmates to cruel and inhuman punishment forbidden by the eighth amendment. In their prayer for relief, plaintiffs request, *inter alia*, that the court order defendants to submit comprehensive plans covering all aspects of jail restoration and repair, operation, and administration to assure the state–wide elimination of unconstitutional practices and conditions in county jails. Plaintiffs' argument is that a uniform set of standards should be devised for all jails alike so that a county prisoner is granted the same rights, irrespective of where he may be incarcerated. Plaintiffs acknowledge that no less than 20 county jails in Mississippi have been subjects of previous federal court litigation in class actions brought by inmates, and most, if not all, such jails are presently operated pursuant to federal court orders, yet they assert that bringing individual jail suits against county officials is too cumbersome and time–consuming to effectively secure the constitutional rights of the total jail population.[2]

## I. EVIDENCE

At the evidentiary hearing plaintiffs submitted a comprehensive report on county jails prepared by the Mississippi State Board of Health (P. Ex. 1), which outlined the diversity of county jail conditions. Principal features of this report deal with (1) inmate overcrowding, (2) need for jail repair and renovation, (3) food service deficiencies, (4) elimination of fire and other hazards, (5) provision and maintenance of clothing, bedding and linens, (6) improvement of health care services, and (7) inadequate staff qualifications and training. One–half of the jails were reported to have overcrowded conditions which might be alleviated in various ways. More than one–third of the jail facilities were found to have some need for repair and renovation. The survey revealed that among county jails there was a considerable range in the quality of food service, and recommended that local officials obtain technical assistance to upgrade jail food service and, where older buildings existed, that county officials

**2.** The following counties have jails which either presently operate under federal court judgments or are confronted with inmate class actions charging unconstitutional conditions: Clay, Choctaw, Copiah, Harrison, Hinds, Jackson, Kemper, Lafayette, Lee, Madison, Marshall, Montgomery, Panola, Simpson, Sunflower, Tippah, Tunica, Warren, Yalobusha, and Yazoo.

contract for food service with outside agencies. Most of the jails had inadequate programs for maintenance and safety procedures. Two–thirds of the jails furnished sheets and towels to prisoners; more than half provided clothing for prisoners. Few jails provided an adequate level of laundry service. All jails had some degree of medical service although the level varied greatly, as most facilities conducted regular sick calls and provided doctors and dentists, and local officials were generally aware of acute medical problems in jails. Few jails, however, had adopted measures for preventive health service.

The Board's report stated that approximately 12 local jails were in a pilot program sponsored by the American Medical Association and the Mississippi Medical Association to develop model jail health care system. The survey also indicated that many jails were staffed with poorly trained and underpaid attendants, noting that the hiring of more qualified personnel should be an integral part of any program to improve jail conditions. It was emphasized that trained personnel can recognize, avoid or eliminate many of the health care and problems in jail environment. The report concluded with the observation that improvement in jail conditions from a public health standpoint must be based upon the initiative and concern of local officials in charge of the institution, and that it appeared unwise to place responsibility for enforcing jail health and safety standards in a state agency since final responsibility for operating county jails is with local officials.[3]

Plaintiffs also presented letters sent by the State Fire Marshal's Office to various county sheriffs reporting on recent inspections and recommending fire safety improvement at the county jails. These inspections, carried out under the state's Standard Fire Prevention Code, revealed a great range of local conditions. For exam-

ple, Lee County jail was given an excellent report, the Fire Marshal stating "tremendous improvements have been made and this jail is one of the better jails. It appears that a safe environment has been established for the protection of the inmates." Also the report on the new Tunica County jail found that its design and construction "is probably the most advanced of any in the state and is certainly a credit to the county and, especially to your office." The recommendations varied as to each county jail inspected. While the Humphreys County sheriff was notified that no fire violations were observed in his jail, the sheriffs of Sharkey and Ittawamba Counties were advised of extensive improvements needed to achieve fire safety.

This court judicially knows from records and files in *Gates v. Collier*, GC 71–6–K, the pending Mississippi State Penitentiary case, that county jails throughout the state presently house 1219 convicted felony offenders who either serve their sentences in jail or are transferred to the state penitentiary as housing becomes available. Since January 1977, state prison officials have been prohibited by court order from accepting inmates in excess of the number which can be accorded 50 square feet of living space per inmate. *Gates v. Collier*, 423 F.Supp. 732 (N.D.Miss.1976). By this formula, Parchman has a present maximum capacity for 2469 inmates and a population of 2415. As additional housing facilities at Parchman become available and penitentiary prisoners are released, convicted inmates in county jails are transferred to the penitentiary to serve the remainder of their sentences. It is reasonable to believe that the burden of space problems confronting some county jails has been primarily brought about by the limited housing facilities at the state penitentiary. In recognition of this unusual burden upon county jails, the State Board of Corrections reimburses each county the

---

**3.** Other recent publications concerning local jails are a 1978 study entitled "A Local Correctional Survey for the State of Mississippi," by the Department of Criminal Justice, University of Southern Mississippi; and a 1980 Report on "Jail Operations–A Guide for County & Munici-

pal Governments," submitted by Center for Governmental Technology, Mississippi Cooperative Extension Service, Mississippi State University. These reports, as well as certain newspaper articles, have been widely distributed to state and local officials.

actual cost of feeding and housing a felony offender, not to exceed $7 per day, and the cost of medical attention. Miss.Code Ann. § 47–5–112 (1972), as amended by H.B. 663, Laws of 1980.

Plaintiffs presented two county sheriffs, Ricky Banks of Leflore County, and Jack Harrison of Quitman County, as witnesses. Banks stated that his jail, with a 75 bed capacity, averages 50 inmates. Of this number, 32 offenders are presently held for transfer to Parchman, the others are pretrial detainees who are generally incarcerated about two weeks. Banks stated that he had notified the Leflore County Board of Supervisors about jail deficiencies, requesting more space, more recreation area, more jailors and fireproof mattresses and pillows. The board has renovated showers and toilet facilities. Though his jail had an emergency evacuation plan, fire drills were not given. He affirmed that inmates could obtain law books from the adjoining courthouse law library and that there are posted rules and regulations. A physician visits the jail twice weekly and upon an inmate's written request. The jailor serves as cook and, assisted by inmates, prepares food on weekly menus formulated by the county health department which regularly inspects the kitchen. Juveniles are separated from adults, men from women, and pretrial detainees from convicted prisoners. In Banks' opinion, overcrowding at his jail is chiefly due to holding state prisoners for transfer to Parchman. On cross–examination, Banks stated that state officials gave no directions for operating his jail, that he had sole authority in running the facility, and that all operating funds were locally provided by his board of supervisors, other than the state's reimbursement for state prisoners. Although Sheriff Banks has made no comparative study of county jails, he has visited the new facility at Warren County and is aware that new jails are being built in Tallahatchie County. He conceded that different conditions existed between his jail and three other county jails with which he was familiar.

Sheriff Harrison stated the Quitman County jail has a capacity for 38 beds and on occasions it is filled to capacity. Harrison presently holds 11 prisoners for the state and attributes overcrowding in his jail to the delay in getting the penitentiary to accept inmates. The jail is an old structure with deficient electrical wiring and plumbing; a new jail costing $500,000 is under construction and should be in operation within six months. There is little classification of inmates due to limited space; juveniles and women are kept in downstairs cells, and men upstairs. The jail has no posted written jail rules. Present mattresses and pillows are of combustible material, but noncombustible mattresses have been ordered by the board of supervisors. Medical attention is provided inmates as needed, and law books are available across the street from the jail at the county courthouse. Food service for three meals each day is contracted for with a local restaurant. Fire drills are irregular. As with the Leflore County jail, inmates wash their own clothes in the cell, and the county provides no clothing to inmates. On cross–examination, Harrison stated he had visited jails in Leflore, Coahoma, Panola and Lafayette Counties and that his jail is much smaller and older than those jails. Harrison receives no directions from state officials as to how the jail should be operated, and all funds for the jail are provided by his county board of supervisors, except the state's reimbursement for felony offenders.

Also testifying were four of the named plaintiffs: Terry Rose, Eugene Stewart, Linda West and Charlie Dougherty.

Rose was an inmate in the Pontotoc County jail for two months before he was transferred to Parchman on April 15, 1980. While in the county jail he saw no fire exits or fire extinguishers, nor was he told how to evacuate the jail in case of fire or other emergency. He observed that the jail had a state side for convicted offenders and a county side for pretrial detainees, juveniles were not kept separate from adults and women were often placed in cells adjoining those of male prisoners. Rose thought the food service was satisfactory, but complained about inadequate medical and den-

tal care and said there was no program of outdoor exercise. He found the sanitary conditions to be extremely poor; showers were caked with filth and fungus and commode odors were sickening. Poorly ventilated, the jail was cold in winter. The jail was in poor repair, with electric wires hanging loose. Inmates were furnished only a blanket and no sheets or other bedding, and they washed their clothes in the cell sink. Rose was never told about the availability of law books, and he saw no posted jail rules and regulations. He testified that he was kept in isolation and chained to the cell bed for ten days; when guarded by inmates, he was raped twice. On cross–examination, Rose admitted he was isolated for his own protection and that he had to be hospitalized for self–inflicted injuries. The inmate denied he subsequently tried to commit suicide and stated he was committed to the state hospital at Whitfield for psychiatric examination. After his transfer to Parchman, Rose sought the aid of the Pontotoc sheriff to be returned to the county jail upon a promise that he would cause no trouble. Notwithstanding bad jail conditions, Rose said he preferred the county jail over Parchman to be near his family. Rose had never been in any other county jail in Mississippi and had no knowledge of conditions existing elsewhere. Rose also has an individual suit pending in federal court against Pontotoc County officials because of alleged mistreatment during his confinement.[4]

Eugene Stewart, a penitentiary prisoner, was incarcerated at the Humphreys County jail for about 30 days, from February 20 to March 18, 1980. He found the jail to be overcrowded with inmates sometimes sleeping on the floor. The jail was old and poorly constructed, with walls in bad shape and broken glass in windows. Sanitation was bad, and roaches and insects infested the jail. He said the food, served twice daily, was very poor and served at irregular times. No eating utensils were provided and inmates ate with their fingers. No clothing was provided, and all inmates sentenced by the court were placed in the same cell area. On cross–examination, Stewart admitted that he received medical attention and was given prescription medicine three times during his stay in the jail. Stewart had no familiarity with other county jails.

Linda West, incarcerated for eight days in the Jones County jail, was transferred to Parchman on April 25, 1980. She found the jail to be poorly structured and unsanitary. She described how black mold had accumulated in the shower room, and how roaches and insects infested the cells. She thought there was poor ventilation, and she froze at night and burnt up during the day. On one occasion West said ten females were placed in the women's cells which had only four beds; on cross–examination, she acknowledged that the women were brought in late at night on drunk charges and released the next morning. Although she never requested a doctor, West said inmates had to scream and holler at the deputy in charge to obtain medical attention. She saw no posted prison rules and was unaware of any classification of prisoners. A free–world person, aided by trusties, cooked two meals a day. She was provided no bedding or clothing, but the jail had an outdoor recreation area. She knew nothing about the availability of law books but never requested law books. She, too, had been in no other county jail and had no knowledge of conditions elsewhere.

Charlie Dougherty was an inmate in the Lauderdale County jail approximately two months before being transferred to Parchman on June 24, 1980. He noticed 43 to 45 inmates in his cell block area, which he believed had a capacity of no more than 40. On some occasions inmates slept on the table or floor, but the overcrowded condition would clear within several days. No clothing or bedding other than a blanket was provided inmates. Dougherty saw no posted jail rules, nor was he aware of an emergency evacuation plan. He stated that

---

4. Rose wrote Dexter Kemp, who had been a fellow inmate first at the local jail and later at Parchman, enlisting his aid in his federal court suit, stating: "All you have to say is that you seen the sheriff and Toy and Ed beat me. I'll win the lawsuit. I'll pay you well." (D. Ex. 3).

the Lauderdale jail had a "white" side and a "black" side, and although blacks sometimes were placed on the white side, whites were never put on the black side. On cross–examination, Dougherty stated that women were kept separate from men prisoners and juveniles were separately housed in another building. He saw fire extinguishers in the front portion of the jail, and weekly visitation was allowed on two days. Three daily meals were served at regular hours. Dougherty also had no familiarity with any other county jail beyond an overnight stay in the Harrison County jail enroute to the Parchman prison.

## II. APPLICABLE LAW

In Mississippi the county jail is an autonomous operation almost completely under the control of the county board of supervisors and the sheriff. The board has authority to erect the jail and keep it in good repair, § 19–3–41; and the board must inspect the jail at least once every three months and take measures to secure prisoners against escape, sickness and infection and assure cleanliness, § 19–5–1. When it becomes necessary, the board is empowered to remodel, enlarge or replace the existing jail building, § 19–7–11, and it arranges to feed prisoners either by contracting with outside sources, allowing the sheriff to purchase food and supplies in the county's name, or granting the sheriff an allowance for that purpose, § 19–25–73. Upon conviction, prisoners must be furnished clothing and substantial food at county expense, § 47–1–47. The county sheriff has charge of the daily operation of the jail and of the prisoners, § 19–25–69. Designated as county jailor, the sheriff has the duty to provide for all inmate needs, § 19–25–71, including medical aid, § 47–1–57. The county health officer, upon instructions from the board of supervisors, is empowered to investigate the sanitary conditions of the jail and make recommendations to the supervisors and the State Board of Health, § 41–3–41.

■ Perhaps the only limitation upon county officials exercising plenary control over county jails is the authority of the State Board of Health, which has not been named as a defendant. That board does have the duty to investigate sanitary conditions of all public buildings, including jails, recommend appropriate sanitation measures, § 41–3–15, and promulgate sanitary rules and regulations to be locally enforced by the county health officer, § 41–3–17. Although the Department of Corrections reimburses counties for housing felony offenders, § 47–5–112(4) expressly provides that the Department of Corrections has no "administrative authority or responsibility for the construction, funding, administration or operation of county or other local jails" and "county officials ... operating the jail shall assume complete responsibility for the proper care and confinement of the offender." In view of this statutory structure, we are of the opinion that the state officials sued by the plaintiffs have no authority over the maintenance, administration or operation of county jails and that no judgment against them could effectuate the relief sought by plaintiffs. Therefore, the amended complaint fails to state a claim for relief against the state defendants.

■ The burden is upon plaintiffs to show that their suit qualifies as a Rule 23 class action, not only on behalf of a plaintiff class of inmates but also against local county officials sued as representatives of a defendant class of supervisors, sheriffs and county health officers. To meet this burden, plaintiffs are required to demonstrate that "there are questions of law or fact common to the class," "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and "the representative parties will fairly and adequately protect the interests of the class." Rule 23(a)(2), (3) and (4), F.R.Civ.P. In addition, plaintiffs must establish that each of the classes sought to be certified is maintainable under at least one of the Rule 23(b) subsections. Of course, certification of a plaintiff class would be futile if a defendant class could not be certified, and under the peculiar facts of this case, the action must proceed, if at all, by a class of plaintiffs against a class of defendants.

■ As to the plaintiff class, we look first to the "commonality" requirement. Rule 23(a)(2) "does not require that all the questions of law and fact raised by the dispute be common; nor does it establish any quantitative or qualitative test of commonality. All that can be divined from the rule itself is that the use of the plural 'questions' suggests that more than one issue of law or fact must be common to members of the class." 7 C. Wright & A. Miller, Federal Practice and Procedure, § 1763, pp. 603–04. Plaintiffs' proof tends to establish that the physical and environmental conditions at county jails in the state are so divergent that it is virtually impossible to state with certainty what may be common issues. For example, to entertain plaintiffs' primary claim of unconstitutional deprivation of eighth amendment rights, the court is called upon to ascertain whether the total conditions of confinement are so deficient as to transgress standards of human decency, *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), *aff'd* 501 F.2d 1291 (5 Cir. 1974); *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), *aff'd* 442 F.2d 308 (8 Cir. 1971). Proof that such unconstitutional conditions exist in one county jail can hardly be said to establish that similar conditions were present in other jails operated by entirely different officials. On the contrary, the evidence plainly shows that there is great diversity among county jails as to age, state of repair, size, extent of possible overcrowding, as well as provision for food, clothing and bedding for inmates. As noted by the State Board of Health, deficiencies found to be common to most county jails are, primarily, inadequate laundry service and inadequate programs for maintenance and safety procedures. Shortcomings of this type, of course, fall far short of the constitutionally intolerable conditions alleged by plaintiffs. We thus conclude that at least insofar as physical and environmental conditions are concerned, the differences among county jails are of such magnitude that it is difficult to identify significant common questions of law or fact. To do justice to the parties, the court visualizes the necessity for innumerable separate hearings with respect to many, if not all, of the county jails. Such procedure would, of course, nullify the very reason for allowing a class action.

■ Similarly, we find the "typicality" requirement is lacking in this case. Although Rule 23(a)(3) does not mean that the claims or defenses of the representative parties need be identical with the class members, they surely must be similar enough to permit the court to conclude that the claims of the absent class members, plaintiff as well as defendant, will be fully presented. *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 691 (E.D.Pa.1977). The (a)(3) requirement is met "if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory. On the other hand, Rule 23(a)(3) may be used to screen out class actions when the legal or factual position of the representatives is markedly different from that of other members, even though common questions of law or fact are raised." Wright & Miller, *supra*, § 1764 at 157. In the case sub judice, the legal and factual theories of the named plaintiffs differ markedly–such disparate controversies as Terry Rose's due process grievance against the Pontotoc County sheriff and Charlie Dougherty's equal protection claim against Lauderdale County officials emphasize the lack of typicality of plaintiffs' numerous claims.

■ Plaintiffs also have (a)(4) problems. Adequacy of representation, required by Rule 23(a)(4), goes toward insuring that the interests of the representative parties are not adverse to the class members and are more or less coextensive with members of the class. *Sommers v. Abraham Lincoln Savings & Loan Ass'n*, 66 F.R.D. 581, 588 (E.D.Pa.1975). The eight named inmates, formerly incarcerated in county jails and now imprisoned in the state penitentiary, are not entitled to injunctive and declaratory relief. *Ridley v. Hopper*, 485 F.2d 1377 (5 Cir. 1973). These plaintiffs have only individual claims for monetary damages. Also, four other named plaintiffs, awaiting transfer to Parchman, are subject to like

disqualification at any time. Even assuming that these individuals may represent a class of persons seeking injunctive and declaratory relief, there is no assurance that inmates confined presently or in the future in county jails will have their dominant interest in eliminating unconstitutional jail conditions and practices pressed with the same vigor as the claims of the representative plaintiffs for large damages are likely to be. This potential antagonism could be alleviated only by creating a subclass of persons formerly incarcerated and seeking money damages separate from the class of inmates seeking injunctive and declaratory relief. This subclass would have to fall under (b)(3), and, in addition to the 23(a) deficiencies, it is clear that the rigorous requirements of (b)(3)–the predominance of common questions and superiority of the class action device–are not met.

We are also of the opinion that plaintiffs have failed to establish the maintainability of defendant classes. Plaintiffs propose defendant classes of sheriffs, boards of supervisors, and county health officers. In addition to commonality, typicality, and adequacy of representation problems, plaintiffs have failed to show that these defendant classes fall into one of the 23(b) subcategories. Plaintiffs allege that these classes may be certified under (b)(2). We disagree. Rule 23(b)(2) is applicable only when "the party opposing the class [i. e., the plaintiff class] has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Id.* Under (b)(2), the injunctive or declaratory relief must run *in favor* of the class sought to be certified, *i. e.*, the defendant class.

We agree with Wright & Miller and other courts that "an action to enjoin a class from pursuing or failing to pursue some course of conduct would not fall under Rule 23(b)(2) and would have to qualify under Rule 23(b)(1) or Rule 23(b)(3) in order to be given class action treatment." 7A Wright & Miller, *supra*, § 1775 at 21–22.

We recognize the split of authority on this point and note that the Fifth Circuit recently expressly declined to reach the issue. *See Greenhouse v. Greco*, 617 F.2d 408, 413 n.6 (5 Cir. 1980), and cases cited therein. Nonetheless, we believe that a fair reading of Rule 23(b)(2) leads to the inescapable conclusion that it may not be used as a basis for certification of a defendant class that does not seek injunctive or declaratory relief in its behalf–either by way of counterclaim or as a practical matter when plaintiffs seek a declaration as to the constitutionality of a statute or of similar administrative policy. *See Paxman v. Campbell*, 612 F.2d 848, 854 n.9 (4 Cir. 1980); *Mudd v. Busse*, 68 F.R.D. 522, 530 (N.D.Ind.1975), aff'd mem. 582 F.2d 1283 (7 Cir. 1978), *cert. denied*, 439 U.S. 1078, 99 S.Ct. 858, 59 L.Ed.2d 47 (1979); *Gibbs v. Titelman*, 369 F.Supp. 38, 53 (E.D.Pa.1973); *Technograph Printed Circuits, Ltd. v. Methode Electronics*, 285 F.Supp. 714, 723 (N.D.Ill.1968). *But see United States v. Trucking Employers, Inc.*, 75 F.R.D. 682, 691–95 (D.D.C.1977). Here, as in *Paxman*, there is no state statute or policy governing the operation of county jails and county officials are free to adopt, within constitutional bounds, whatever policies they deem fit. Since there is no risk of inconsistent adjudications "which would establish incompatible standards of conduct" or adjudications "which would as a practical matter be dispositive of the interests of the other members not party to the adjudications or substantially impair or impede their ability to protect their interests," the *defendant classes* do not fall within Rule 23(b)(1). Furthermore, since the class action device would not be a superior method of adjudicating plaintiffs' claims and common questions do not predominate over individual questions, Rule 23(b)(3) is unavailable. We therefore conclude that, like the proposed plaintiff class, the proposed defendant classes may not be certified.

Plaintiffs rely upon several class action jail cases which we find to be readily distinguishable. In two cases, the plaintiff class of inmates sued defendant classes of offi-

cials seeking injunctive relief against unconstitutional statutes or a single unconstitutional administrative practice. In *Washington v. Lee*, 263 F.Supp. 327 (M.D.Ala. 1966), *aff'd* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), the court allowed a plaintiff class action against the Commissioner of the Alabama Board of Corrections, which joined a defendant class consisting of all county sheriffs and municipal wardens in charge of the state's county and city jails, challenging the legality of racial segregation in the state penal system and the county and municipal jails. Unlike the present case, *Washington* was limited to the sole issue of invalidating state statutes requiring segregation in penal institutions and ordering state–wide desegregation in those facilities. In *Marcera v. Chinlund*, 595 F.2d 1231 (2 Cir.), *vacated on other grounds, sub nom. Lomard v. Marcera*, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979), a case cited by the Fifth Circuit in *Greenhouse, supra*, the inmate plaintiff class enjoined a defendant class of 47 sheriffs to comply with a program of contact visitation to pretrial detainees mandated by prior federal court orders as well as a regulation of the State Corrections Commission. Chief Judge Kaufman, in holding the case was maintainable as a (b)(2) action, equated the state–wide administrative practices of the sheriffs with a statute.[5]

In three other cases cited by plaintiffs, the plaintiff class did not sue class defendants. In *Singleton v. Board of Commissioners*, 356 F.2d 771 (5 Cir. 1966), the plaintiff class action was against a Florida state agency which operated reform schools to eliminate racial segregation required by statute and administratively practiced in those institutions. The Fifth Circuit in *Jones v. Diamond*, 519 F.2d 1090 (5 Cir.

1975), *rehearing en banc granted*, 602 F.2d 1243 (5 Cir. 1979), discussed the propriety of a Rule 23(b)(2) action by the inmate plaintiff class against local officials complaining of conditions of confinement in the Jackson County, Mississippi, jail. *Miller v. Carson*, 563 F.2d 757 (5 Cir. 1977), allowed the plaintiff class to sue designated officials responsible for operating the Duval County Jail at Jacksonville, Florida. In *Dimarzo v. Cahill*, 575 F.2d 15 (1 Cir.), *cert. denied, sub nom. Dimarzo v. Hall*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978), the court allowed a class action by plaintiff inmates against specific officials attacking confinement conditions in the Essex County jail and House of Corrections. Obviously, these cases have little resemblance to a (b)(2) action against a defendant class directed at widely divergent conditions and practices in county jails throughout an entire state. Moreover, since the present case cannot be certified as to the defendant class, it would be legal error to certify a state–wide plaintiff class inasmuch as there is no case or controversy between the local officials of the eight representative counties and former, present or future inmates of jails in other counties. *Marcera, supra*, at 1238.

We therefore sustain the motion to strike all class allegations from the suit and dismiss the amended complaint without prejudice to plaintiffs' right to prosecute individually their claims against the county officials in charge of the jail of any county.

Let an order issue accordingly.

---

**5.** We recognize that this case is not precisely congruent to the usual suit against a class of local public officials. Plaintiffs here are not attacking the facial validity of a locally administered statute of statewide effect, see *e. g., Washington v. Lee*, 263 F.Supp. 327 (M.D.Ala.1966) (3–judge court), *aff'd per curiam*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), but rather a series of similar administrative practices. Nevertheless, the distinction is immaterial under

the facts of this case. The challenged behavior of the 42 sheriffs–denial of contact visitation–is identical; it could not be more so were they acting pursuant to statute rather than their own administrative policies. Since declaratory and injunctive relief is sought against identical behavior, we conclude that this case is a proper (b)(2) defendant class action.

*Marcera*, supra, at 1238 n.10.